STATE OF CONNECTICUT *v.* OLES J. BAPTISTE
(AC 28718)

Bishop, McLachlan and Berdon, Js.

Argued December 4, 2008—officially released June 2, 2009

*Annacarina Jacob*, senior assistant public defender, for the appellant (defendant).

*Lisa A. Riggione*, senior assistant state's attorney, with whom, on the brief, were *Michael L. Regan*, state's attorney, and *Stephen M. Carney*, assistant state's attorney, for the appellee (state).

*Opinion*

McLACHLAN, J. The defendant, Oles J. Baptiste, appeals from the judgment of conviction, rendered after a jury trial, on charges of one count of assault of a peace officer in violation of General Statutes § 53a-167c (a) and two counts of interfering with an officer in violation of General Statutes § 53a-167a (a). On appeal, the defendant claims that (1) the trial court inadequately instructed the jury on the essential elements of §§ 53a-167a and 53a-167c and, consequently, the instruction relieved the state of its burden of proving beyond a reasonable doubt every element set forth in the statutes, and (2) the court improperly permitted the state to question him about his fourteen prior arrests for interfering with a police officer and engaging police officers in pursuit. We affirm the judgment of the trial court.

The jury reasonably could have found the following relevant facts. On November 29, 2005, at approximately 3 p.m., Detectives James Tetreault[1] and Corey Poore, of the Norwich police department, set up surveillance for drug related activities outside the residence of Robert L'Homme, located at 28 8th Street in Norwich. During the surveillance, the officers observed a motor vehicle with three occupants stop at L'Homme's residence. The passenger in the front seat exited the vehicle, entered the residence and in less than one minute returned to the vehicle. The officers followed the vehicle for approximately 200 or 300 yards until it left the road. The officers approached the vehicle and spoke with the occupants, who admitted that they had purchased crack cocaine from a Jamaican male inside of L'Homme's residence. At that time, the officers decided to return to L'Homme's residence with another detective, Robert Blanch, to investigate the drug dealer.

The officers wore plain clothes, but they displayed their badges.[2] They knocked on the front door, and L'Homme allowed them inside. The officers encountered the defendant in a bedroom located in the back of the apartment. Poore, recognizing the defendant from numerous previous contacts and observing him trying to chew and swallow something, believed that he was trying to swallow crack cocaine. Poore also identified a female in the bedroom with the defendant as a known crack cocaine user and prostitute. Poore did not verbally identify himself as a police officer because he and the defendant knew each other well.[3] Poore asked the

---

[1] At the time of trial, Tetreault was a sergeant with the Norwich police department.

[2] Poore and Blanch wore their badges on their belts, and Tetreault wore his badge on a chain around his neck.

[3] Poore had known the defendant for almost thirteen years at the time of the defendant's arrest. When Poore was a bicycle patrol officer, he encountered the defendant almost daily. In addition, when Poore would shop at the defendant's place of business, the defendant would approach him, and it was clear that he recognized Poore as a police officer.

defendant for consent to search him, and the defendant consented. Poore also informed the defendant that the police had information that he was dealing crack cocaine out of the apartment. The defendant did not respond. After Poore conducted a standard search and did not find contraband, he turned his attention to the female occupant in the room. Poore began speaking with the female, and the defendant tried to push his way out of the bedroom. Blanch and Poore tried to calm the defendant, but the defendant became more excited and aggravated. The defendant continued to push by the officers and encountered Tetreault in the kitchen area.

The officers continued to try to gain control of the situation by calming down the defendant so that they could continue their investigation. The defendant was combative and used his feet to push off of kitchen appliances. All three officers were engaged in a physical struggle to maintain control over the situation. Tetreault tried to prevent the defendant from pushing past him by grabbing the defendant's shoulders and then wrapped his arm around the defendant's shoulder and chest areas. The defendant bit Tetreault on his lower left bicep, causing pain and bruising. Tetreault yelled out and stated that the defendant had bitten him. At that time, the officers decided to arrest the defendant for assaulting Tetreault. The officers had to subdue the defendant physically by bringing him to the floor and handcuffing him.

The officers took the defendant outside the apartment where a uniformed officer, Steven Lamantini, had arrived with a marked patrol car. After the defendant was taken outside, he continued to kick, scream and act aggressively. The defendant was placed in the cruiser, where he tried to kick out the back window of the cruiser and damaged a rear dash light by slamming his head into it. Lamantini removed the defendant from the

vehicle, and the defendant attempted to bite Lamantini.[4] The defendant was not compliant with Lamantini, who ordered the defendant to stop resisting. Another officer arrived with pepper spray and employed it on the defendant. At that point, the defendant calmed down and was transported to the police station.

Tetreault was treated at William W. Backus Hospital, receiving inoculations, a precautionary baseline test for the human immunodeficiency virus and treatment and bandaging of his wound. The bite wound was approximately two inches in diameter and caused a scar. The defendant was charged with assaulting Tetreault and interfering with Poore and Lamantini.

I

The defendant first claims that by providing an "inadequate, misleading and incomplete" instruction regarding §§ 53a-167a and 53a-167c and failing to instruct the jury on General Statutes §§ 53a-22[5] and 53a-

---

[4] The defendant attempted to bite Lamantini's left arm but was able only to close his teeth on Lamantini's uniform shirt.

[5] General Statutes § 53a-22 provides in relevant part: "(a) For purposes of this section, a reasonable belief that a person has committed an offense means a reasonable belief in facts or circumstances which if true would in law constitute an offense. If the believed facts or circumstances would not in law constitute an offense, an erroneous though not unreasonable belief that the law is otherwise does not render justifiable the use of physical force to make an arrest or to prevent an escape from custody. . . .

"(b) Except as provided in subsection (a) of this section, a peace officer . . . is justified in using physical force upon another person when and to the extent that he or she reasonably believes such to be necessary to: (1) Effect an arrest or prevent the escape from custody of a person whom he or she reasonably believes to have committed an offense, unless he or she knows that the arrest or custody is unauthorized; or (2) defend himself or herself or a third person from the use or imminent use of physical force while effecting or attempting to effect an arrest or while preventing or attempting to prevent an escape.

"(c) A peace officer . . . is justified in using deadly physical force upon another person for the purposes specified in subsection (b) of this section only when he or she reasonably believes such to be necessary to: (1) Defend himself or herself or a third person from the use or imminent use of deadly physical force; or (2) effect an arrest or prevent the escape from custody

23,[6] the court deprived him of his due process rights to have the state prove every element of the offenses charged and to present a defense.[7] Specifically, the defendant claims that (1) the court's failure to instruct on §§ 53a-22 and 53a-23 shifted, diluted or alleviated the state's burden of proving intent on the charges of assault on a peace officer and interfering, (2) the court's instructions, without including any instruction on § 53a-22 and the limits of force that may be used by police, did not fully and adequately instruct the jury on how to determine whether the police properly were acting within the performance of their duties, (3) the court's instructions were inadequate on whether the police were reasonably identifiable and (4) the court improperly held that the use of force to protect oneself from excessive force by police or from any force when the police were not reasonably identifiable is not a valid justification defense. We disagree.

The defendant testified as to the following facts.[8] At approximately 3 p.m. on November 29, 2005, the defendant was in Norwich on business and saw

---

of a person whom he or she reasonably believes has committed or attempted to commit a felony which involved the infliction or threatened infliction of serious physical injury and if, where feasible, he or she has given warning of his or her intent to use deadly physical force."

[6] General Statutes § 53a-23 provides in relevant part: "A person is not justified in using physical force to resist an arrest by a reasonably identifiable peace officer . . . whether such arrest is legal or illegal."

[7] The defendant makes his claim under both the fourteenth amendment to the United States constitution and the constitution of Connecticut, article first, § 8. He has not, however, provided any independent analysis of his claim under the Connecticut constitution. Without a separate and sufficient analysis of his state constitutional claim pursuant to *State* v. *Geisler*, 222 Conn. 672, 684–85, 610 A.2d 1225 (1992), we limit our review to his federal constitutional claim. See, e.g., *State* v. *Colon*, 272 Conn. 106, 154 n.26, 864 A.2d 666 (2004), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005); *In re Candids E.*, 111 Conn. App. 210, 211 n.2, 958 A.2d 229 (2008).

[8] The defendant spent the first seventeen years of his life in Haiti. Although he spoke some English, the defendant was assisted at trial by an interpreter.

L'Homme on the street.[9] L'Homme waved to the defendant, and the defendant pulled his vehicle over to speak with him. The defendant asked L'Homme about the injuries to L'Homme's face, which looked like the result of a beating. L'Homme stated that he could not stay outside but invited the defendant into his apartment to talk. L'Homme and the defendant entered the apartment and proceeded to the bedroom where a woman was sitting. L'Homme introduced her as his girlfriend, gave the defendant beer and sat down next to the woman. The defendant sat down in a chair in front of L'Homme and the woman.

The defendant also testified that less than five minutes later there was a knock at the door that L'Homme got up to answer. A man the defendant did not know[10] entered the room, looked at the defendant and asked, "what you got?" The man did not identify himself as a police officer. The man touched the defendant's pocket, did not find anything and continued to search the bedroom, including a jacket on the bed. The man started talking to the woman, and they began arguing. The defendant believed that the man was either a robber, the woman's boyfriend or the person who had assaulted L'Homme. The defendant did not consider that the man who patted him down might be a police officer.

Additionally, the defendant testified that he did not want to get involved and got up to find L'Homme in the living room. When the defendant tried to leave, someone started choking him from behind. The defendant testified that the man "must [have been] sneaking in the house somewhere" to get behind the defendant

[9] At the time of the incident, the defendant had known L'Homme for five or six years.

[10] The defendant testified on cross-examination that Poore was the man who entered the room. The defendant also testified that he had never seen Poore before he walked into L'Homme's bedroom on November 29, 2005.

when he was walking toward the front door of the apartment. The defendant testified that he was scared for his life, so he pulled the man's arm off of his neck and bit the man's arm.[11] The first man came running into the living room, catching the defendant's legs, and the defendant slipped and slammed into the ground. A third man joined in the struggle, and the three men held the defendant's feet and arms and kicked him in the face and beat him.

The defendant testified that he first thought the men might be police officers when they handcuffed him. At that point, he kept calling out, "brother, brother, why do this to me, why doing this to me?" After they handcuffed him, the three officers continued to assault him, even after they had placed him in the back of a patrol car.

Finally, the defendant testified that at no point had the men identified themselves as police officers and that none of the men had police badges showing. As soon as he found out that they were police officers, he apologized and began begging.

The defendant submitted a request to charge[12] on the issue of self-defense. The request included instructions that (1) the evidence raised the issue of self-defense, (2) the state must disprove self-defense beyond a reasonable doubt, (3) reasonable physical force used when a person reasonably believes that such force is necessary is a legal defense to the use of force that would

[11] The defendant testified that he thought that he was going to die because he could not breathe and that he had a seizure.

[12] The defendant's request to charge was noted on the record but was not made a part of the court file. The defendant supplied us with a copy of his request to charge, and the state has not challenged the authenticity of the document. Additionally, the request to charge is in line with the defendant's oral request to charge and his exception to the court's instructions. Accordingly, we will consider the substance of the request to charge in our analysis of the defendant's claim.

otherwise be criminal, and (4) set forth selected provisions of General Statutes § 53a-19.[13] Before the court, the defendant stated that he had submitted one request to charge on self-defense under § 53a-19 and asked for that to be included in the charge. The state objected on the ground that such a charge was not appropriate on the basis of the evidence and the law. The court stated that it had reviewed the statute and would not be giving a self-defense charge because on the "charge [of] interfering and assault on a police officer, if the jury finds—and in the charge it does tell them this—if they find that the police were not acting in the performance of their duties, then they must find the defendant not guilty . . . . [I]f they were acting in the performance of their duties, then he would not have a self-defense argument based on the statute. Also, we had a discussion—and what might be considered a compromise with counsel knowing I wasn't doing the self-defense charge—to add a passage to the jury to give them an option on the state of mind of the defendant at the time, which I think assist[s] you in the defense at the same time it does not go for a full self-defense charge, which I don't think is appropriate." The defendant took an exception to the court's ruling.

The court continued: "So, with that, I think *every other part of the jury charge is agreed upon*. Is that true?" (Emphasis added.) Defense counsel replied: "Yes, Your Honor."

The court instructed the jury in relevant part: "The name of the statute [the defendant is] charged with is

[13] General Statutes § 53a-19 (a) provides: "Except as provided in subsections (b) and (c) of this section, a person is justified in using reasonable physical force upon another person to defend himself or a third person from what he reasonably believes to be the use or imminent use of physical force, and he may use such degree of force which he reasonably believes to be necessary for such purpose; except that deadly physical force may not be used unless the actor reasonably believes that such other person is (1) using or about to use deadly physical force, or (2) inflicting or about to inflict great bodily harm."

assault on public safety personnel in violation of [§] 53a-167c of the Penal Code, which provides as follows: A person is guilty of assault on public safety personnel when, with intent to prevent a reasonably identifiable peace officer from performing his duties, and while such peace officer is acting in the performance of his duties, the defendant caused physical injury to such peace officer.

"For you to find the defendant [guilty] of this charge, the state must have proven the following elements: one, the victim of the assault was a reasonable identifiable peace officer or known to the defendant as a peace officer; two, the conduct of the defendant occurred while that peace officer was acting in the performance of his duties; three, that the defendant had the specific intent to prevent the peace officer from performing his lawful duties; and four, that the defendant caused physical injury to the peace officer.

"A peace officer is defined as a member of an organized police department, to wit, in this case, the Norwich police department. Physical injury means impairment of physical condition or pain. The law does not require the injury to be serious; it may be minor. If the officer is acting under a good faith belief that he is carrying out his duty and if his actions are reasonable to that end, he's acting in the performance of his duties.

"The phrase 'in the performance of his duties' means that the police officer is simply acting within the scope of what he's employed to do. The test is whether the police officer was acting in his capacity as an officer or engaging in some frolic of his own. You will make this determination based on the circumstances of this case.

"Also, it's necessary that the person being arrested either knew or should have known that the other person was a peace officer, and the standard you would apply as jurors is whether a reasonable person under the

same circumstances should have identified that other person as a peace officer.

"The defendant is also charged with two counts of interfering with a peace officer. The defendant is charged with that charge—two counts of—under Connecticut General Statutes [§] 53a-167a of the Penal Code, which provides as follows: A person is guilty of interfering with an officer when such person obstructs, resists, hinders or endangers a peace officer in the performance of such peace officer's duties. For you to find the defendant guilty of this charge, the state must have proven the following elements beyond a reasonable doubt; one, that the defendant obstructed, resisted or endangered a peace officer; two, that the conduct of the defendant occurred while the police officer was in the performance of his duties; and three, that the defendant intended to obstruct, resist, hinder or endanger the peace officer while that peace officer was in the performance of his duties. A peace officer, once again, is a member of an organized police department.

"If you find that the officer was not a peace officer, then you would find the defendant not guilty. If you find that he was a peace officer, you would go on to the other elements of this crime and, with the first element, there [are] four words describing the way interference may be committed. Obstructs means to interpose obstacles or impediments to impede or in any manner to intrude or prevent. These words do not imply the use of direct force or the exercise of direct means. Resist means oppose by direct, active or forcible or quasi-forcible means. Hinders means to make slow or difficult the progress to hold back or delay or impede or prevent action by the police.

"If the officer is acting under a good faith belief that he is carrying out his duty and if his actions are reasonably designed to that end, he's acting in the performance

of his duties. The phrase, again, 'in the performance of his duties,' means a police officer simply acting within the scope of his employment. The test is whether the police officer was acting in his capacity as a police officer or—as I said earlier—engaging in a frolic of his own. You will make that determination based on the circumstances of the case.

"So, if you find the state has proven beyond a reasonable doubt the elements I have described to you of two counts of interfering with an officer and one count of assault on a peace officer, then you would find the defendant guilty. On the other hand, if you find that the state has not proven the charges beyond a reasonable doubt, you would find the defendant not guilty."

The defendant took no further exception to the court's instructions.

A

First, the defendant argues that the court improperly failed (1) to instruct the jury on §§ 53a-22 and 53a-23, and (2) to instruct the jury adequately on whether the police were reasonably identifiable. The defendant cannot prevail on these unpreserved claims because he is not entitled to relief pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), or, in the alternative, under the plain error doctrine. See Practice Book § 60-5.

The defendant admits that he did not properly object or take exception to the court's jury instructions as to §§ 53a-22 and 53a-23 or as to whether the police officers were reasonably identifiable as such. He argues, however, that the court's failure to instruct the jury properly constituted a violation of his constitutional rights, thereby allowing for *Golding* review of his claim.

Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all*

of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail. The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances." (Emphasis in original.) *State* v. *Golding*, supra, 213 Conn. 239–40.

The record in the present case is adequate for our review because it contains the full transcript of the trial proceedings and therefore satisfies the first prong of *Golding*. Additionally, we conclude that the defendant's claim, insofar as it challenges the adequacy of the court's instruction on the elements, is reviewable under the second prong of *Golding* as well, and we examine the merits of the defendant's claim under the remaining prongs of *Golding*. See *State* v. *Fauntleroy*, 101 Conn. App. 144, 154, 921 A.2d 622 (2007).

The defendant's claim is determined by our analysis under the third prong of *Golding*, which asks whether the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial. "Ordinarily, [w]here . . . the challenged jury instructions involve a constitutional right, the applicable standard of review is whether there is a reasonable possibility that the jury was misled in reaching its verdict. . . . In evaluating the particular charges at issue, we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is . . .

whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view [the instructions] as improper." (Internal quotation marks omitted.) *State* v. *Brewer*, 283 Conn. 352, 359, 927 A.2d 825 (2007).

Our Supreme Court has determined, however, that "unpreserved, waived claims, fail under the third prong of *Golding* . . . . A defendant in a criminal prosecution may waive one or more of his or her fundamental rights. . . . In the usual *Golding* situation, the defendant raises a claim on appeal which, while not preserved at trial, at least was not waived at trial." (Citation omitted; internal quotation marks omitted.) Id., 360.

"[W]aiver is the intentional relinquishment or abandonment of a known right. . . . [A] valid waiver calls into question the existence of a constitutional violation depriving the defendant of a fair trial for the purpose of *Golding* review [and it] also thwarts plain error review of a claim." (Citation omitted; internal quotation marks omitted.) *State* v. *Wells*, 111 Conn. App. 84, 88–89, 957 A.2d 557, cert. denied, 289 Conn. 958, 961 A.2d 423 (2008).

We have held that a "defendant could not satisfy the third prong of *Golding* where he had implicitly waived at trial a challenge to the alleged constitutional deprivation that was the basis of his claim on appeal. Therefore, a defendant cannot prevail under *Golding* on a claim that he implicitly waived at trial." (Internal quotation marks omitted.) *State* v. *Akande*, 111 Conn. App. 596, 607, 960 A.2d 1045 (2008), cert. granted, 290 A.2d 918, 966 A.2d 237 (2009), quoting *State* v. *McDaniel*, 104 Conn. App. 627, 634, 934 A.2d 847 (2007), cert. denied, 285 Conn. 912, 943 A.2d 471 (2008). In *Akande*, we

declined "to draw a distinction between defense counsel stating that he had no problem with a jury charge that he specifically requested and defense counsel stating that he had no problem with a jury charge that he had not specifically requested." *State* v. *Akande*, supra, 609. We also concluded that "[t]here is also no difference between counsel stating that he has no comment about the charge and counsel stating that the charge as read was correct. In both cases, we find the objection to be waived." Id. Finally, we concluded that "[a] constitutional right that has been waived at trial cannot be resurrected successfully on appeal . . . by invoking the *Golding* doctrine." (Internal quotation marks omitted.) Id.

In the present case, the defendant submitted a request to charge only as to self-defense under § 53a-19. After the court denied the defendant's request, the court asked counsel: "So, with that, I think every other part of the jury charge is agreed upon. Is that true?" Defense counsel's response was: "Yes, Your Honor." Following what the defendant now claims was an inadequate instruction, he took no exception. The defendant not only failed to alert the court to any potential errors, but affirmatively expressed his agreement with the proposed instructions. "Although the state must ordinarily prove even the undisputed elements of the crime charged, it is not necessary that a defendant's waiver of that requirement be express." (Internal quotation marks omitted.) *State* v. *Arluk*, 75 Conn. App. 181, 193, 815 A.2d 694 (2003). To allow the defendant to seek reversal now would amount to allowing him to induce potentially harmful errors and then ambush the state with that claim on appeal. Accordingly, because the defendant waived his claims, he cannot satisfy the third prong of *Golding*, as any claimed constitutional violation was clearly waived. Additionally, on the basis of

the defendant's waiver, we are not persuaded that plain error exists with regard to his claims.

## B

The defendant also argues that the court improperly refused to instruct the jury on self-defense as set forth in § 53a-19. We disagree.

Our Supreme Court has recognized that "[w]hen a defendant admits the commission of the crime charged but seeks to excuse or justify its commission so that legal responsibility for the act is avoided, a theory of defense charge is appropriate. . . . If the defendant asserts a recognized legal defense and the evidence indicates the availability of that defense, such a charge is obligatory and the defendant is entitled, as a matter of law, to a theory of defense instruction . . . . [A] defendant is entitled to have instructions presented relating to any theory of defense for which there is any foundation in the evidence, no matter how weak or incredible. . . . A fundamental element of due process is the right of a defendant charged with a crime to establish a defense." (Internal quotation marks omitted.) *State* v. *Davis*, 261 Conn. 553, 573, 804 A.2d 781 (2002). It has also held, however, that "when a defendant is charged only with a violation of § 53a-167a (a) or § 53a-167c (a), logically, there is no call for the defendant to raise the defense of self-defense. Rather . . . the proper defense to those charges in cases in which the defendant claims that the police officer had used unreasonable and unnecessary physical force is that the police officer was not acting in the performance of his duty." Id., 574. The court also noted that "[i]f justified by the evidence, the defendant may also raise the defense that he reasonably did not know that the assaulted person was a police officer." Id., 574 n.18.

In the present case, the defendant was charged only with violations of §§ 53a-167a (a) and 53a-167c (a).

Accordingly, he was not entitled to raise the defense of self-defense and was not entitled to the instruction that he requested.[14] See id., 574.

## II

The defendant also claims that the court improperly permitted the state to cross-examine him about his fourteen prior arrests for interfering with a police officer and his conviction for engaging police officers in pursuit. Specifically, the defendant claims that the court improperly allowed the state to question him about (1) prior arrests to impeach his credibility on the basis of inconsistent statements without a prior finding that he had made a statement inconsistent with having been arrested fourteen times, (2) prior convictions that were misdemeanors not related to truthfulness or veracity and (3) prior arrests and convictions that were unduly prejudicial.

At trial, the defendant testified that he respected police, did not know that Tetreault was a police officer and bit Tetreault only because Tetreault was choking him from behind. The defendant testified on direct examination that he felt sorry that he bit Tetreault because he had respect for police. The defendant also testified on direct that he respected the police because he had no family in the United States so that if he had a problem, he had to call the police for protection. On cross-examination, the defendant testified that he had respect for the police because they protect people and that the police should be cooperated with. The defendant also testified that he "never talk[ed] to police too

---

[14] The defendant also argues that this court should reconsider our Supreme Court's holding in *Davis* and instead adopt the reasoning set forth in *State v. Nunez*, 546 S.W.2d 759 (Mo. App. 1977). We cannot do so. It is not within our power as an intermediate appellate court to overrule Supreme Court authority. See *State v. Fuller*, 56 Conn. App. 592, 609, 744 A.2d 931, cert. denied, 252 Conn. 949, 748 A.2d 298, cert. denied, 531 U.S. 911, 121 S. Ct. 262, 148 L. Ed. 2d 190 (2000).

much." The state then asked the defendant if he cooperated with police when he spoke with them. Defense counsel objected on the ground of relevance, and the court overruled the objection. The defendant answered that he had not had a lot of contact with the police and that he had "no problem" with police. The state then asked the defendant whether he had been arrested fourteen times. Defense counsel again objected, and the court called for a sidebar, and a discussion took place off of the record. Following the sidebar, the court overruled the objection and allowed the state to question the defendant about his fourteen prior arrests. The defendant did not state on the record the basis of his objection, and the court did not state on the record the reason for overruling it.[15]

---

[15] The following exchange took place during the cross-examination of the defendant:

"[The Prosecutor]: Well, the first question [was]: When you talk to a police officer, are you cooperative with the police officer?

"[Defense Counsel]: Your Honor, I'm going to object at this point just because I don't know what kind of relevance this has got to do with what the trial is about at this point. You know, he's just talking generalities now and just, 'generally, are you cooperative?' I think the relevance is gone at this point, Your Honor.

"The Court: [Prosecutor]?

"[The Prosecutor]: It's a credibility claim, Your Honor, and I'm real close.

"The Court: I'll overrule your objection based on the charges here [which] do have to do with obstructing or hindering police, so I'll allow it. But could you move it along?

"[The Prosecutor]: And do you feel, sir, that you have been cooperative with the police?

"[The Defendant]: A couple of times because I pull over and the police talk to me. I have no problem.

"[The Prosecutor]: Okay. And are you also saying that you have not had a lot of contact with police officers?

"[The Defendant]: I no have contact. Actually, when I was working, a police I knew. That one, I knew him; he use[d] to come in with his wife. I remember his name because one day he walk through my job, and I was talk[ing] to my boss; he said—the first time I did not know him, and he asked me if I got a problem, and I said, 'yeah, I got a problem,' and he say, 'what happened?' I tell him I need a ride for work, I don't got no ride, I've been coming late, and one day he come in and he's an old guy named Smitty—Smitty, and old guy he gave me a ride. That's the only police I know.

The defendant claims that the court improperly allowed the state to question him about his fourteen prior arrests for interfering with a police officer and engaging police officers in pursuit. He argues that the

"[The Prosecutor]: Okay. And that's the only police officer you've had contact with?

"[The Defendant]: Yeah, because he give me a ride. I believe that's the contact.

"[The Prosecutor]: Okay. But you've been arrested fourteen times?

"[Defense Counsel]: Objection, Your Honor.

"The Court: Well, sidebar.

"(Off the record sidebar.)

"The Court: Okay. Your objection is overruled, proceed . . . .

"[The Prosecutor]: Do you agree, sir, that you've been arrested fourteen times?

"[The Defendant]: I have a little difficulty before back in the day.

"[The Prosecutor]: And do you agree that a lot of those arrests took place in the city of Norwich?

"[The Defendant]: I have difficulty with my son's mother. I was young back in the day.

"[The Prosecutor]: Do you agree that some of those arrests resulted in convictions for interfering with a police officer?

"[The Defendant]: I believe so. They stick police in the court now, which got conspiracy I see between me; they try to do something to me.

"[The Prosecutor]: Answer the question. Do you agree that you got convictions for interfering with a police officer and the answer to that is yes?

"(Interpreter helping the defendant interpret.)

"[The Defendant]: When I just get to this country because I didn't know the legal system here, they told me to plead guilty, so I plead guilty on those things.

"[The Prosecutor]: Okay. And do you also agree that you've been convicted of engaging police officers in pursuit?

"[The Defendant]: About that time I was not doing the thing. I was not doing these things. They found me; I was not driving that time. The police pick me up from the street because the building belong to my brother-in-law. They picked me up from the street, and when they call my house, I use[d] to live with my sister-in-law and my brother-in-law; when they call the house, my sister-in-law, she think I might have the car, but they pick me up from the street, and when they pick me up from the street and they take [me] to Mohegan and they show me the car, I saw the plate number and they asked me if I know the car. I tell them, yes, I know the car, and they take me to jail for that.

"[The Prosecutor]: The question is, do you agree that you've been convicted of engaging a police officer in pursuit?

"[The Defendant]: I don't think that was why—what I had was nothing to do with that.

"[The Prosecutor]: Fair enough. No further questions, sir.

"[The Defendant]: They asked me to plead."

state's questions were irrelevant and unfairly prejudicial. Even if we assume that the court and the state were on notice that the defendant's objection on the ground of relevance was a continuing objection, we conclude that the defendant's objection on the ground of relevance at trial did not preserve for appeal an argument that the admission of evidence of the prior arrests was unfairly prejudicial.

"Our review of evidentiary rulings made by the trial court is limited to the specific legal ground raised in the objection. Practice Book [§§ 60-5 and 5-5]; *State* v. *Rothenberg*, 195 Conn. 253, 262, 487 A.2d 545 (1985); *State* v. *Braman*, 191 Conn. 670, 684–85, 469 A.2d 760 (1983). The reason for this rule is clear: it is to alert the trial court to an error while there is time to correct it; *State* v. *Rothenberg*, supra, 263; *State* v. *Jones*, 193 Conn. 70, 88, 475 A.2d 1087 (1984); and to give the opposing party an opportunity to argue against the objection at trial. To permit a party to raise a different ground on appeal than was raised during trial would amount to 'trial by ambuscade,' unfair both to the trial court and to the opposing party. *State* v. *Brice*, 186 Conn. 449, 457, 442 A.2d 906 (1982); *State* v. *DeGennaro*, 147 Conn. 296, 304, 160 A.2d 480, cert. denied, 364 U.S. 873, 81 S. Ct. 116, 5 L. Ed. 2d 95 (1960)." *State* v. *Sinclair*, 197 Conn. 574, 579, 500 A.2d 539 (1985).

In *Sinclair*, the defendant objected at trial, on the ground of relevance, to a police officer's testimony about the defendant's previous arrests. Id., 578. The defendant then claimed on appeal that the evidence was inadmissible as evidence of prior misconduct because its strong prejudicial impact far outweighed its minimal probative value. Id. Our Supreme Court held that the defendant could not assert a different argument on appeal than the one he had presented to the trial court. Id., 579–80.

In the present case, the defendant objected *at trial on the ground of relevance* to the state's questions about his prior arrests. Accordingly, our review of his claims on appeal is governed by *Sinclair*. Id. Thus, to the extent that the defendant claims that the evidence was not relevant, his claim is reviewable.[16] To the extent, however, that the defendant argues that the evidence was unduly prejudicial, his unpreserved claim cannot be afforded review.[17]

Our standard of review of an evidentiary ruling is well settled. "The trial court's ruling on the admissibility of evidence is entitled to great deference. . . . [T]he trial court has broad discretion in ruling on the admissibility . . . of evidence . . . [and its] ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion." (Internal quotation marks omitted.) *Viera* v. *Cohen*, 283 Conn. 412, 452, 927 A.2d 843 (2007).

"Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either

[16] The defendant makes several arguments about issues to which his testimony was not relevant. In addition, the defendant argues that because there was no limiting instruction, the jury may have considered his prior arrests as propensity evidence. In light of his general objection at trial, his failure to request a limiting instruction and his failure to seek extraordinary review; see footnote 17; we need only determine whether the challenged testimony was relevant in any way to the matters at issue.

[17] The defendant has not requested review of his claims under either the *Golding* or plain error doctrines. In the absence of an affirmative request, we will not engage in such review. See, e.g., *In re Emerald C.*, 108 Conn. App. 839, 852 n.9, 949 A.2d 1266, cert. denied, 289 Conn. 923, 958 A.2d 150 (2008).

more certain or more probable." (Internal quotation marks omitted.) *State* v. *Allen*, 289 Conn. 550, 562, 958 A.2d 1214 (2008).

"Generally, a party who delves into a particular subject during the examination of a witness cannot object if the opposing party later questions the witness on the same subject. . . . The party who initiates discussion on the issue is said to have opened the door to rebuttal by the opposing party. . . .

"When a witness voluntarily testifies . . . he asks the jury to believe him. The jury should be informed about the sort of person asking them to take his word. . . . Matters which might not be strictly relevant on direct examination may be so on cross-examination where that matter is explored for the purpose of credibility. Given that function of cross-examination in shedding light on the credibility of the witness' direct testimony, [t]he test of relevancy is not whether the answer sought will elucidate any of the main issues, but whether it will to a useful extent aid the court or jury in appraising the credibility of the witness and assessing the probative value of the direct testimony. . . . A question is within the scope of the direct examination if it is intended to rebut, impeach, modify or explain any of the defendant's direct testimony . . . .

"The court has wide discretion to determine the scope of cross-examination. . . . Every reasonable presumption should be given in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion. . . . Because of the difficulties inherent in this balancing process, the trial court's decision will be reversed only where abuse of discretion is manifest or where an injustice appears to have been done. . . . Our review is limited to whether the trial court's rulings exceeded the latitude accorded

its discretion in such matters." (Citations omitted; internal quotation marks omitted.) *State* v. *Hernandez*, 224 Conn. 196, 206–208, 618 A.2d 494 (1992).

In the present case, the defendant opened the door to questions about his prior contact with police officers when he testified on direct and during cross-examination that he had little contact with police officers, he respected the police because they protect people, the police should be cooperated with and that he would never knowingly bite a police officer. The defendant portrayed himself as a law abiding citizen with great respect for the police. Accordingly, the defendant's prior arrests and convictions were evidence of his frequent, negative contacts with police and relevant to his credibility as a witness. In light of the defendant's objection solely on the ground of relevance, we cannot conclude that the court abused its discretion.

The judgment is affirmed.

In this opinion BISHOP, J., concurred.

BERDON, J., dissenting. I would not reach the claimed jury instruction issues but would reverse the judgment of the trial court and order a new trial on the issue that the court improperly permitted the state to cross-examine the defendant, Oles J. Baptiste, about his fourteen prior arrests for interfering with a police officer and misdemeanor convictions for interfering with police and engaging police officers in pursuit.[1]

---

[1] Although the majority opinion quotes a portion of the cross-examination by the state, the following is the entire relevant part of the cross-examination.

"[The Prosecutor]: You said that you have respect for the police?

"[The Defendant]: Yes, sir.

"[The Prosecutor]: And when you say you have respect for the police, what do you mean?

"[The Defendant]: I respect everybody, every individual. I respect police because I know police are doing a good job. Some of them are doing a good job to protect people.

"[The Prosecutor]: Okay. And when you say you respect the police because they are doing a good job, you feel that it's important that you're cooperative with police?

"[The Defendant]: You suppose[d] to.

"[The Prosecutor]: Okay. And do you think that that's important?

"[The Defendant]: I believe the police if the police got some question and they come to you, they talk to you as a gentleman, you can cooperate if they want to ask you a couple of questions; you're suppose[d] to.

"[The Prosecutor]: Okay. And you are saying that that's what you've always done, is to be cooperative with police?

"[The Defendant]: Not so far. I never talk to police too much.

"[The Prosecutor]: Okay. You never talk to police too much?

"[The Defendant]: No.

"[The Prosecutor]: When you say that, what do you mean?

"[The Defendant]: Like—

"(Interpreter helping defendant interpret.)

"[The Defendant]: I don't understand the question. I'm trying to say that if I talk to a police, I would.

"[The Prosecutor]: Well, the first question [was], when you talk to a police officer, are you cooperative with the police officer?

"[Defense Counsel]: Your Honor, I'm going to object at this point just because I don't know what kind of relevance this has got to do with what the trial is about at this point. You know, he's just talking generalities now and just, generally, 'are you cooperative?' I think the relevance is gone at this point, Your Honor.

"The Court: [Prosecutor]?

"[The Prosecutor]: It's a credibility claim, Your Honor, and I'm real close.

"The Court: I'll overrule your objection based on the charges here [which] do have to do with obstructing or hindering police, so I'll allow it. But could you move it along?

"[The Prosecutor]: And do you feel, sir, that you have been cooperative with the police?

"[The Defendant]: A couple of times because I pull over and the police talk to me. I have no problem.

"[The Prosecutor]: Okay. And are you also saying that you have not had a lot of contact with police officers?

"[The Defendant]: I no have contact. Actually, when I was working, a police I knew. That one, I knew him; he use[d] to come in with his wife. I remember his name because one day he walk through my job, and I was talk[ing] to my boss; he said—the first time I did not know him, and he asked me if I got a problem, and I said, 'yeah, I got a problem,' and he say, 'what happened?' I tell him I need a ride for work, I don't got no ride, I've been coming late, and one day he come in and he's an old guy named Smitty—Smitty, and old guy he gave me a ride. That's the only police I know.

"[The Prosecutor]: Okay. And that's the only police officer you've had contact with?

"[The Defendant]: Yeah, because he give me a ride. I believe that's the contact.

"[The Prosecutor]: Okay. But you've been arrested fourteen times?

"[Defense Counsel]: Objection, Your Honor.

"The Court: Well, sidebar.

"(Off the record sidebar.)

Although the defendant objected to this cross-examination on the grounds of "relevancy," the majority holds that counsel should have used the magic word "prejudice." When the defendant again objected, the court called for a sidebar conference, which took place off of the record. We do not know what transpired in the sidebar conference.[2]

"The Court: Okay. Your objection is overruled, proceed . . . .

"[The Prosecutor]: Do you agree, sir, that you've been arrested fourteen times?

"[The Defendant]: I have a little difficulty before back in the day.

"[The Prosecutor]: And do you agree that a lot of those arrests took place in the city of Norwich?

"[The Defendant]: I have difficulty with my son's mother. I was young back in the day.

"[The Prosecutor]: Do you agree that some of those arrests resulted in convictions for interfering with a police officer?

"[The Defendant]: I believe so. They stick police in the court now, which got conspiracy I see between me; they try to do something to me.

"[The Prosecutor]: Answer the question. Do you agree that you got convictions for interfering with a police officer and the answer to that is yes?

"(Interpreter helping the defendant interpret.)

"[The Defendant]: When I just get to this country because I didn't know the legal system here, they told me to plead guilty, so I plead guilty on those things.

"[The Prosecutor]: Okay. And do you also agree that you've been convicted of engaging police officers in pursuit?

"[The Defendant]: About that time I was not doing the thing. I was not doing these things. They found me; I was not driving that time. The police pick me up from the street because the building belong to my brother-in-law. They picked me up from the street, and when they call my house, I use[d] to live with my sister-in-law and my brother-in-law; when they call the house, my sister-in-law, she think I might have the car, but they pick me up from the street, and when they pick me up from the street and they take [me] to Mohegan and they show me the car, I saw the plate number and they asked me if I know the car. I tell them, yes, I know the car, and they take me to jail for that.

"[The Prosecutor]: The question is, do you agree that you've been convicted of engaging a police officer in pursuit?

"[The Defendant]: I don't think that was why—what I had was nothing to do with that.

"[The Prosecutor]: Fair enough. No further questions, sir.

"[The Defendant]: They asked me to plead."

[2] This case points out the dangers of sidebar conferences that are off the record. Counsel should be cautious of such conferences with respect to preserving issues for appeal on what may have occurred at the conference and insist that the jury be excused so that a record can be made.

I agree with the majority with respect to our standard of review. "Our review of evidentiary rulings made by the trial court is limited to the specific legal ground raised in the objection." *State* v. *Sinclair*, 197 Conn. 574, 579, 500 A.2d 539 (1985).

At trial, the defendant, on the basis of relevance, objected to the state's questions about his prior arrests. My review of Connecticut case law, however, illustrates that objections on the basis of relevance and objections on the basis of unfair prejudice are interrelated. To be admissible, "[l]ogically relevant evidence must also be legally relevant . . . ." (Internal quotation marks omitted.) *State* v. *Joly*, 219 Conn. 234, 260–61, 593 A.2d 96 (1991). Logically "[r]elevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable." (Internal quotation marks omitted.) *State* v. *Allen*, 289 Conn. 550, 562, 958 A.2d 1214 (2008). Legally relevant evidence is evidence that is "not subject to exclusion for any one of the following prejudicial effects: (1) where the facts offered may unduly arouse the jury's emotions, hostility or sympathy, [or] (2) where the proof and answering evidence it provokes may create a side issue that will unduly distract the jury . . . . Where the prejudicial effect of logically relevant evidence outweighs its probative value, the trial court has wide latitude to exclude the evidence as legally irrelevant, and its decision will not be disturbed absent a manifest abuse." (Citations omitted; internal quotation marks omitted.) *State* v. *Joly*, supra, 261.

"[E]vidence of prior unconnected crimes is inadmissible to demonstrate the defendant's bad character or to suggest that the defendant has a propensity for criminal behavior, [but] such evidence may be admissible for

other purposes . . . ." (Internal quotation marks omitted.) *State* v. *Collins*, 111 Conn. App. 730, 742, 961 A.2d 986 (2008), cert. granted on other grounds, 290 Conn. 911, 964 A.2d 546 (2009). Questions related to prior arrests generally are within the proper scope of cross-examination if they are designed to rebut or impeach direct testimony. See *State* v. *Cooper*, 227 Conn. 417, 431, 630 A.2d 1043 (1993).

In the present case, the defendant testified on direct examination that he respected the police. He also testified on cross-examination that he had very little contact with the police. The state contends that it was permitted to rebut these statements with evidence that the defendant had been arrested fourteen times. It is, however, a basic principle of justice that an accused is innocent until proven guilty. Evidence of the defendant's prior arrests, absent some proof of the defendant's guilt, had only a slight logical connection to whether the defendant respected police officers. Furthermore, the defendant's statement that he had not had a lot of prior contact with the police, which the state also argues opened the door to questions concerning his prior arrests, was unconnected to any material issue in the case. Accordingly, the defendant's objection on the basis of relevance, which was clearly made before the court, should have been sustained. Moreover, in this case, distinguishing between relevance and prejudice is like splitting hairs.

Assuming that referencing the defendant's fourteen prior arrests served a legitimate impeachment value, which it did not, that value clearly was outweighed by unfair prejudice, and, therefore, the arrests were legally irrelevant. The state's questions about the defendant's prior arrests "painted the defendant as a recidivist who flouted the law . . . . Such evidence invited the jury to conclude that if he did it before, he did it this time also." *State* v. *Dunbar*, 51 Conn. App. 313, 325–26, 721

A.2d 1229 (1998), cert. denied, 247 Conn. 962, 724 A.2d 1126 (1999).[3]

Another issue, not addressed by the majority but also not raised by the defendant, that makes this case egregious is the failure of the court to make any effort to minimize the unfair prejudice ensuing from the large number of the defendant's prior arrests and convictions; contra *State* v. *McGraw*, 204 Conn. 441, 450, 528 A.2d 821 (1987) (but trial court precluded state from disclosing number of counts or particulars of arrests); and the court's failure to provide the jury with an instruction limiting the purpose for which it could consider them. Our Supreme Court has held that "in order to vitiate th[e] potential prejudice [of uncharged misconduct], we generally have required the court, *sua sponte if necessary*, to instruct the jury as to the limited purpose for which such evidence is admitted and for which it is to be considered." (Emphasis added; internal quotation marks omitted.) *State* v. *Ouellette*, 190 Conn. 84, 96, 459 A.2d 1005 (1983). Just as the trial court has the obligation to instruct the jury sua sponte of the limited purpose for which such evidence is admitted, we as an appellate court should take the failure to so instruct the jury into consideration even though it was not raised by the defendant on appeal.

---

[3] In reaching this conclusion, I am mindful of our Supreme Court's holding in *State* v. *Sinclair*, supra, 197 Conn. 574. In *Sinclair*, the court held that an objection at trial on the ground of relevance did not preserve for appeal an argument that admission of the defendant's prior arrests was unfairly prejudicial. Id., 578. *Sinclair* is distinguishable from the case now before us. The testimony at issue in *Sinclair* was from a police officer who stated that he recognized the defendant because he had assisted other officers in arrests and worked with photographs of known subjects. Id., 578 n.4.

In this case, I find that the logical relevance of the defendant's fourteen prior arrests was minimal and the unfair prejudice was so great that the defendant's objection should have placed the court on notice that the fourteen arrests were not legally relevant to rebut the defendant's testimony. Therefore, I cannot conclude that our Supreme Court intended the language of *Sinclair* to apply to a case as egregious as the case before this court.

This case, without any doubt, does not speak well for our system of justice.[4] The majority decides it on a play on words—that "relevance" does not embrace "prejudice" and it ignores the fact that the court did not instruct the jury with the limiting instructions that our Supreme Court has directed to be given when a defendant's prior unrelated arrests and convictions are admitted into evidence.

Accordingly, I would reverse the judgment and remand the case for a new trial on the foregoing basis.

I respectfully dissent.

---

[4] Of course, the errors committed by counsel may be corrected by seeking relief through habeas corpus for ineffective assistance of counsel.